## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| JIN KWON, and ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | FILE NO. |
| ROBYN A. CRITTENDEN, SECRETARY OF STATE OF GEORGIA, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. The right to vote is the cornerstone of democracy. However, as one district court judge recently stated: "Voting in a language you do not understand is like asking this Court to decide the winner of the Nobel Prize for Chemistry — ineffective, in other words."[1]

2. Section 21-2-409(b)(2) of the Georgia Code ("Subsection (b)(2)") asks Limited English Proficient ("LEP") voters to do just this—vote in a language they do not understand, without the assistance of an interpreter of

---

[1] *Madera v. Detzner,* 325 F.Supp.3d 1269, 1279 (N.D. Fla. 2018) (Chief Justice Walker order granting motion for preliminary injunction in part).

their choice. This is not only a violation of these voters' fundamental right to cast a meaningful vote, but also a violation of federal statutory and constitutional law.

3. Plaintiffs Jin Kwon and Asian Americans Advancing Justice-Atlanta ("Advancing Justice-Atlanta") (collectively, "Plaintiffs") assert claims under Section 208 of the federal Voting Rights Act of 1965, 52 U.S.C. § 10508 (the "VRA"), Section 2 of the VRA, 52 U.S.C. § 10301, and the First and Fourteenth Amendments to the Constitution of the United States. They seek declaratory and injunctive relief against the continued enforcement of Subsection (b)(2), and all other appropriate relief at law and equity, including reasonable attorney's fees and costs of litigation in accordance with federal law.

## JURISDICTION AND VENUE

4. Plaintiffs' claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims arose in this district. The Defendant Secretary of State is also located in this district.

## PARTIES

6. Plaintiff Jin Kwon is a 65-year-old Korean-American immigrant and resident of DeKalb County, Georgia, where he lives with his wife. Mr. Kwon is a registered voter in DeKalb County, and his precinct is Livsey Elementary School. Mr. Kwon is LEP and requested and received voting assistance from an Advancing Justice-Atlanta interpreter in the November 6, 2018 election (the "November Election"). Subsection (b)(2) has harmed and will continue to harm Mr. Kwon by burdening his right to vote and his ability to receive language assistance from a person of his choice in elections.

7. Plaintiff Advancing Justice-Atlanta is a nonpartisan, nonprofit organization founded in 2010 and located in Norcross, Georgia. Advancing Justice-Atlanta is dedicated to protecting and promoting the civil rights of Asian Americans and Pacific Islanders ("AAPIs") and other immigrant and refugee communities in Georgia through policy advocacy, legal services, impact litigation, and civic engagement. As part of its civic engagement work,

Advancing Justice-Atlanta conducts Get Out the Vote ("GOTV"), voter education, and election protection activities in local, state, and federal elections, with a particular focus on AAPI voters.

8. Defendant Robyn A. Crittenden is the current Secretary of State of Georgia, and is named solely in her official capacity. As Secretary of State, Defendant Crittenden is Georgia's chief election official. Defendant Crittenden's responsibilities include preparing and furnishing information for citizens pertaining to voter registration and voting. O.C.G.A. § 21-2-50(a). Defendant Crittenden also serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to obtain uniformity in the practices and proceedings of election officials and is responsible for promoting the fair, legal, and orderly conduct of all primaries and elections in the state. *Id.* at §§ 21-2-30(d), 21-2-31, 21-2-33.1.

## LEGAL ALLEGATIONS

9. Under Section 208 of the VRA, voters who require assistance with voting due to a disability or inability to read or write may receive assistance from any person of the voter's choice, other than the voter's employer, an agent of the voter's employer, or an officer or agent of the voter's union. 52 U.S.C. § 10508.

10. When it enacted Section 208 of the VRA, Congress explained that giving LEP voters and voters with disabilities the right to an assistor of "their own choice" is "the only way to assure meaningful voting assistance," and that "[t]o do otherwise would deny these voters the same opportunity to vote enjoyed by all citizens." S. Rep. No. 97-417 (1982).

11. For federal elections, the Georgia law regarding assistance to LEP voters and voters with disabilities mirrors Section 208. Specifically, in elections where there is a federal candidate on the ballot, O.C.G.A. § 21-2-409 (the "State Statute") provides that voters who are "unable to read the English language" or have a disability impacting their physical ability to vote may select any person, other than their employer, an agent of their employer, or an officer or agent of their union, to assist them with voting. O.C.G.A. §§ 21-2-409(a) and (b)(1).

12. However, in elections with no federal candidate on the ballot, the State Statute is substantially more restrictive than Section 208 of the VRA and all but precludes assistance for voters with limited English proficiency or disabilities. In these elections, voters with disabilities or who are unable to read English are limited to receiving assistance from (1) a registered voter in

their precinct, (2) an immediate family member or other statutorily specified

family member, or (3) the voter's caretaker, if any. Subsection (b)(2).

13. Subsection (b)(2) also limits the number of voters that any one person can

assist in a state or local election to ten, while there is no such limit under

Section 208 of the VRA.

## FACTUAL ALLEGATIONS

### Disproportionate Burden On Georgia's Limited English Proficient Population

14. For AAPIs and Latino Americans, who historically have the lowest voter

turnout among all races,[2] language barriers persist as an obstacle for them to

meaningfully participate in the civic process.[3]

15. For hundreds of thousands of AAPIs and Latino Americans in Georgia,

English is a second, third, or even fourth language. Thus, while only 5.6% of

the general population in Georgia is limited English proficient,[4] significantly

higher percentages of the Latino-American and AAPIs communities are

---

[2] *Black Voter Turnout Rate Declined Sharply in 2016, Dropping Below That of Whites*, PEW RESEARCH CENTER, *available at* http://www.pewresearch.org/fact-tank/2017/05/12/black-voter-turnout-fell-in-2016-even-as-a-record-number-of-americans-cast-ballots/ft_17-05-10_voter-turnout/ (last visited Nov. 27, 2018).

[3] *Asian-American Groups Tackle Language Barriers to Get Out Vote*, NBC NEWS, *available at* https://www.nbcnews.com/news/asian-america/asian-american-groups-tackle-language-barriers-get-out-vote-n239901 (last visited Nov. 27, 2018); *2016 May Not Be the Year of the Latino Vote, But Time Is On Its Side*, NBC NEWS, *available at* https://www.nbcnews.com/news/latino/2016-may-not-be-year-latino-vote-time-its-side-n636091 (last visited Nov. 27, 2018).

[4] *See* U.S. Dep't of Justice, Federal Coordination and Compliance Section, 2014 Language Map App, *available at* https://www.lep.gov/maps/lma2014/Final_508/ (last visited Nov. 23, 2018).

LEP. Eighty-one percent of Asian Americans in Georgia speak a language other than English at home,[5] and 44% speak English less than "very well."[6] Similarly, 79% of the Hispanic and Latino populations in Georgia speak a language other than English at home;[7] 38% speaks English less than "very well."[8] By contrast, less than 1% of non-Hispanic or Latino White residents speak English less than "very well."[9]

16. The LEP rates are even higher among certain AAPI ethnic communities in Georgia. Forty-seven percent of Korean Americans, for example, speak English less than "very well."[10] The same is true for more than half of the Chinese-American community.[11] And the rate of limited English proficiency

---

[5] *See* Asian and Pacific Islander American Vote, 2018 Fact Sheet, *available at* http://www.apiavote.org/sites/apiavote/files/GA-2018.pdf (last visited Nov. 23, 2018).

[6] *Id.*

[7] *See* U.S. Census Bureau, *Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (Hispanic or Latino)*, AM. FACTFINDER, *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_17_1YR _B16006&prodType=table (last visited Nov. 23, 2018).

[8] U.S. Census Bureau, *Nativity by Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (Hispanic or Latino)*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B16005I&prodType=table (last visited Nov. 27, 2018).

[9] U.S. Census Bureau, *Nativity by Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (Hispanic or Latino)*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B16005H&prodType=table (last visited Nov. 27, 2018).

[10] U.S. Census Bureau, *Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_17_1YR _B16001&prodType=table (last visited Nov. 27, 2018).

[11] *Id.*

is higher still among Vietnamese Americans, 66% of whom characterize their ability to speak English as less than "very well."[12]

17. AAPIs and Latino Americans also comprise a disproportionately large segment of the LEP population in Georgia. There are approximately 522,940 Georgians who identify as LEP.[13] While AAPIs make up only 3.7% percent of Georgia's total population,[14] they are approximately 19% of the state's LEP population. Latino Americans likewise represent 63% of the state's LEP population while accounting for only 9% of the total population.[15]

18. Congress has recognized that limited English proficiency can impede a citizen's ability to fully engage in American civic life. To address the way "various practices and procedures" have "effectively excluded [citizens of language minorities] from participation in the electoral process," 52 U.S.C. §

---

[12] *Id*.

[13] U.S. Census Bureau, *Nativity by Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B16005&prodType=table (last visited Nov. 27, 2018).

[14] U.S. Census Bureau, *Race,* AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B02001&prodType=table (last visited Nov. 27, 2018).

[15] U.S. Census Bureau, *Nativity by Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B16005&prodType=table (last visited Nov. 27, 2018); U.S. Census Bureau, *Hispanic or Latino Origin by Race*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B03002&prodType=table (last visited Nov. 27, 2018).

10503(a), Congress passed the language assistance provisions of the VRA in 1975, codified at Section 203 of the Act. Section 203 requires jurisdictions throughout the United States to provide ballots and other election materials in languages other than English when certain language minority groups reach a numeric threshold in order to ensure that LEP voters are able to exercise the electoral franchise. *See id*; James Thomas Tucker, *Enfranchising Language Minority Citizens:  The Bilingual Election Provisions of the Voting Rights Act*, 10 N.Y.U. J. LEGIS. & PUB. POL'Y 195 (2006).

19. Congress has recognized that limited English proficiency can impede a citizen's ability to fully engage in American civic life. To address the way "various practices and procedures" have "effectively excluded [citizens of language minorities] from participation in the electoral process," 52 U.S.C. § 10503(a), Congress passed the language assistance provisions of the VRA in 1975, codified at Section 203 of the Act. Section 203 requires jurisdictions throughout the United States to provide ballots and other election materials in languages other than English when certain language minority groups reach a numeric threshold in order to ensure that LEP voters are able to exercise the electoral franchise. *See id*; James Thomas Tucker,

*Enfranchising Language Minority Citizens:  The Bilingual Election Provisions of the Voting Rights Act*, 10 N.Y.U. J. LEGIS. & PUB. POL'Y 195 (2006).

20. More recent data also supports Congress's determination that difficulty with English is a barrier to civic engagement in immigrant communities. In a 2012 post-election survey administered to 6,609 AAPI voters across the U.S., 8% of respondents cited limited English proficiency as a reason for not voting. This survey also showed lower voter turnout among AAPIs who are LEP than those who are not.[16] Conversely, a study published in 2016 suggests a causal relationship between language support services provided under Section 203 and increased voter registration among Latino Americans and increased voter turnout among Asian-American voters.[17]

21. Yet, Section 203 does not cover any jurisdictions in Georgia except Gwinnett County, which was designated in December 2016 as a covered

---

[16] *Behind the Numbers: Post Election Survey of Asian American and Pacific Islander Voters in 2012*, NAT'L ASIAN AM. SURVEY, *available at* http://naasurvey.com/wp-content/uploads/2015/10/2012-aapipes-national.pdf (last visited Nov. 27, 2018).

[17] Bernard L. Fraga & Julie Lee Merseth, *Examining the Casual Impact of the Voting Rights Act Language Minority Provisions*, 1 THE J. OF RACE, ETHNICITY, AND POLITICS 31-59 (2016), *available at* https://www.cambridge.org/core/journals/journal-of-race-ethnicity-and-politics/article/examining-the-causal-impact-of-the-voting-rights-act-language-minority-provisions/5710388D382A230F83AAA762010E90F8.

jurisdiction for the Spanish language,[18] after refusing an earlier request from two Latino-American rights groups to voluntarily provide Spanish ballots to its residents.[19]

22. As a covered jurisdiction under Section 203, Gwinnett County is now required to administer its elections in both English and Spanish. But, despite the diverse makeup of its residents—including the 11% who are AAPI[20]—Gwinnett County offers no translation or interpretation services to voters in any language besides Spanish. And no other county in the entire state of Georgia provides any language assistance to LEP voters *at all.* As a result, despite the half of a million Georgians who are LEP, nearly all elections throughout the state are administered exclusively in English.

**Social and Historical Conditions of Discrimination in Georgia**

23. The restrictions on a voter's options for language assistance under Subsection (b)(2) work in concert with social and historical conditions of discrimination in Georgia to deny Asian-American and Latino-American

---

[18] 81 Fed. Reg. 233, *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-12-05/pdf/2016-28969.pdf.

[19] David Wickert, *Gwinnett Rejects Call for Spanish Ballots*, ATLANTA J. & CONST., https://www.ajc.com/news/local-govt--politics/gwinnett-rejects-call-for-spanish-ballots/5WqvUFwDnbbxWa9Mcxl1fK/ (last visited Nov. 27, 2018).

[20] U.S. Census Bureau, *Detailed Race*, AM. FACTFINDER, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR_C02003&prodType=table (last visited Nov. 27, 2018).

voters an equal opportunity to meaningfully vote and participate in the political process.

24. Georgia's long and well-documented history of systematic racism is baked into the voting laws of the state. As one district court aptly put it: "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994).

25. Because of its history of state-sponsored discrimination, Georgia was for years subject to Section 5 of the VRA, requiring it to receive preclearance from the U.S. Department of Justice ("DOJ") or a three-judge district court panel for every voting change it sought to implement.[21]

26. But Georgia's past history of discrimination in voting is not even past. Georgia is rife with recent examples of voting-related discrimination too.

27. For example, the Secretary of State is currently implementing a voter registration protocol that places would-be voters in "pending" status if their

---

[21] *See About Section 5 of the Voting Rights Act*, U.S. DEP'T OF JUSTICE, *available at* https://www.justice.gov/crt/about-section-5-voting-rights-act (last visited Nov. 27, 2018).

voter registration data does not *exactly* match the same information as it

appears in other state databases. This protocol froze approximately 53,000

voter registrations—80% of which belonged to people of color—in advance

of the November Election. The protocol is the subject of pending litigation,

which alleges that the protocol disproportionately burdens Black, Latino-

American, and Asian-American voters. *See* Dkt. No. 15, *Ga. Coalition for*

*the People's Agenda v. Kemp,* 1:18-cv-04727-ELR (N.D. Ga. Oct. 19, 2018).

28. Prior iterations of this "exact match" protocol also bear indicia of race-

based discrimination. The DOJ objected to the first version that was

submitted for preclearance in 2008, describing it as "error-laden" and

"possibly improper" and noting that it incorrectly flagged thousands of

naturalized citizens as non-citizens.[22]

29. The DOJ further noted that the "flawed" protocol "frequently subject[ed] a

disproportionate number of African-American, Asian, and/or Hispanic

voters to additional and … erroneous burdens on the right to register to

vote."[23] Latino-American and Asian-American voters were, for example,

---

[22] Letter from Loretta King, Acting Assistant Attorney Gen., Dep't of Justice, to Thurbert E. Baker, Ga. Attorney Gen. (May 29, 2009), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_090529.pdf.
[23] *Id.* at 4.

more than twice as likely as White applicants to be flagged under the protocol.[24]

30. The DOJ pre-cleared a second iteration of the "exact match" voter registration protocol in 2010, but that version also proved to disproportionately burden voters of color. Specifically, of the approximately 35,000 voters that the protocol removed from the voter rolls between 2013 and 2016, 76% identified as Black, Latino-American, or Asian-American. *See* Dkt. No. 1, *Ga. State Conf. of the NAACP v. Kemp,* No. 2:16-cv-00219, at ¶ 88 (N.D. Ga. Sept. 14, 2016). A federal lawsuit filed against the Secretary of State by several civil rights organizations in 2016 resulted in a settlement agreement that ended this protocol. Only a few months later, the Georgia General Assembly passed the current iteration of the "exact match" protocol.

31. The Georgia General Assembly routinely attempts to pass bills that would aggressively restrict or altogether prohibit state and local governmental agencies from offering services or conducting business in any language other than English. In 2011, the Georgia Senate introduced House Bill 72 ("HB 72"), which would have required the state driver's license test to be

---

[24] *Id.*

administered only in English. HB 72 would have made it difficult for LEP

voters to obtain a drivers' license, creating additional burdens on the voting

process by making it more difficult to provide an acceptable photo ID and to

get to the polls.

32. In 2014, Senate Resolution 1031 ("SR 1031") sought to amend the Georgia

Constitution to make English the state's official language and prohibit the

use of any language other than English in any state or local government

document, meeting, proceeding, or publication. SR 1031 also created a

private right of action against any governmental agency or official alleged to

be in violation of its provisions. SR 1031 did not pass the Senate.

33. Undeterred, the Senate re-introduced—and this time successfully passed—

an identical bill, Senate Resolution 675 ("SR 675"), in 2016. After more

than 200 ethnic business groups, churches, and other organizations

condemned or lobbied against SR 675, however, the Georgia House did not

pass SR 675.

34. In 2018, the Senate tried yet again to constitutionally enshrine English as

the official language of Georgia and mandate that all state and local

governmental agencies conduct business exclusively in English through

Senate Resolution 587 ("SR 587") and Senate Resolution 613 ("SR 613").

Like their predecessors, SR 587 and SR 613 declared English to be "the common language of the State of Georgia and the United States" and asserted a "compelling state interest" in "promoting, preserving, and strengthening the use of English."

35. All iterations of the "English only" bill that the Senate sought to pass would have prohibited the dissemination of ballots and other election-related documents in any language other than English in violation of federal law.

**Other Factors Relevant to the Totality of Circumstances in Georgia**

36. All elections in Georgia have a majority vote requirement.  O.C.G.A. § 21-2-501. This requirement makes electing candidates of their choice more difficult for Latino-American and Asian American voters because they comprise a minority of the electorate.

37. Voting patterns in Georgia are racially polarized. Courts have repeatedly found that racially polarized voting exists at the statewide, county, and local levels. *See, e.g.,* Dkt. No. 25, *Ga. State Conference of the NAACP v. Gwinnett County,* 1:16-cv-02852-AT (N.D. Ga. Oct. 6, 2016); *Georgia v. Ashcroft*, 195 F.Supp.2d 25, 88 (D.D.C. 2002), *rev'd on other grounds*, 539 U.S. 461 (2003); *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of*

*Comm'rs*, 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

38. Latino Americans and AAPIs have not been elected to public office in Georgia at a rate that is commensurate with their share of the population. All of the current *statewide* elected officials are White, and AAPIs and Latino Americans are vastly underrepresented in both the Georgia General Assembly and the state's Congressional delegation. Of the 236 elected officials that will comprise the 2019 Georgia General Assembly, only three are Asian-American; only two, Latino-American. And no Congressional members representing Georgia are either Asian-American or Latino-American.

39. A Latino-American woman was in fact prohibited from running for a State House seat earlier this year. In May 2018, the Secretary of State disqualified Maria Palacios as a candidate for an uncontested primary race for Georgia State House District 29. State House District 29 encompasses Hall County, Georgia, which has a population that is 27% Hispanic or Latino.[25]

---

[25] *See* U.S. Census Bureau, *Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (Hispanic or Latino)*, AM. FACTFINDER, *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B03003&prodType=table (last visited Nov. 27, 2018).

40. The basis for Ms. Palacio's disqualification was the Secretary of State's interpretation of a state constitutional provisional requiring that candidates for the state House of Representatives be "citizens of the state for at least two years" "[a]t the time of their election." Ga. Const. Art. I, § 1, ¶ 7. Although Ms. Palacio had been a resident of Georgia for nine years, she did not become a U.S. citizen until 2017. The Secretary of State concluded that Ms. Palacio could not be considered a "citizen of the state" under the Georgia Constitution until she became a naturalized citizen of the U.S. in 2017.

41. Finally, despite the severe burdens that Subsection (b)(2) places on LEP voters in non-federal elections, it is entirely arbitrary and fails to serve the stated purpose of the State Statute—i.e., to "provide a secret and private ballot." To the contrary, Subsection (b)(2) significantly restricts a voter's choice of assistance and increases the risk that a voter will be forced to seek assistance from someone the voter does not know or trust, undermining the state's interest.

**Advancing Justice-Atlanta and its Language Assistance Efforts**

42. To help address the gaps in state-provided language assistance to LEP voters and ensure that LEP voters are able to fully engage in the civic

process, Advancing Justice-Atlanta conducts all of its civic engagement activities, such as voter registration, voter education and GOTV efforts, in multiple languages, including Spanish, Vietnamese, Korean, and Chinese. For example, Advancing Justice-Atlanta routinely recruits multilingual volunteers to canvas AAPI and other immigrant voters to provide nonpartisan information about upcoming elections. Additionally, Advancing Justice-Atlanta provides written elections materials, such as "Know Your Voting Rights" pamphlets and voter guides, in multiple languages and runs a multilingual voter hotline during elections.

43. In addition to its usual GOTV and election protection activities, Advancing Justice-Atlanta also ran a language assistance and interpretation program for LEP voters during the November Election. As a part of this program, Advancing Justice-Atlanta recruited and trained volunteers fluent in Spanish, Vietnamese, Korean, Chinese, or Hindi to be able to provide language assistance to LEP voters at the polls during early voting and on Election Day. Multilingual Advancing Justice-Atlanta staff members were also trained on how to serve as interpreters for LEP voters.

44. In the weeks leading up to the November Election, Advancing Justice-Atlanta advertised its services to AAPI and Latino-American communities,

providing a telephone number voters could call to request language assistance at the polls. This included advertising in ethnic newspapers and on Asian media. If an LEP voter called to request language assistance, Advancing Justice-Atlanta arranged for an interpreter to accompany the voter to his or her polling place. During early voting and on Election Day, Advancing Justice-Atlanta also stationed interpreters at various polling places in order to provide LEP voters with on the spot language assistance, if requested.

45. As part of their training, Advancing Justice-Atlanta educated interpreters about the language assistance provisions under both state and federal law. It specifically advised interpreters that the restrictions of Subsection (b)(2) would not apply in the November Election since every ballot would include a federal candidate. Advancing Justice-Atlanta provided this education to ensure that LEP voters would not be wrongly denied their choice of an interpreter at the polls.

46. Nonetheless, Subsection (b)(2) caused various LEP voters to face difficulties receiving language assistance at the polls on Election Day. Poll workers wrongly believed or were confused about whether the restrictions of Subsection (b)(2) applied. Their confusion delayed the voting process and,

in some instances, caused voters and interpreters to feel frustrated, intimidated, or both.

47. Despite these issues, Advancing Justice-Atlanta was able to collectively provide voting assistance to almost 70 LEP community members during the November Election. In most cases, the interpreter met the criteria for providing assistance to the voter under O.C.G.A. § 21-2-409(b)(1) and Section 208, but not Subsection (b)(2). Therefore, had the November Election not included a federal candidate on the ballot, Georgia law would have barred Advancing Justice-Atlanta interpreters from providing assistance to LEP voters in a vast majority of these instances.

48. Further, at least one Advancing Justice-Atlanta staff member who is fluent in Korean assisted approximately 20 LEP voters who contacted the Advancing Justice-Atlanta office before Election Day to request language assistance. Since the November Election included a federal candidate on the ballot, interpreters were not limited to helping 10 people. However, the upcoming runoff election on December 4 ("December Runoff") will not have a federal candidate on the ballot. Based solely on this fact, Subsection (b)(2) forbids any single person from helping more than 10 LEP voters.

49. Mr. Kwon is one of the LEP voters whom Advancing Justice-Atlanta assisted during the November Election. Mr. Kwon contacted the Advancing Justice-Atlanta office on November 5 to request language assistance at the polls after seeing an ad for their services on Korean TV. On November 6, an Advancing Justice-Atlanta staff member accompanied Mr. Kwon and his wife, who is also an LEP voter, to their polling place at Livsey Elementary School in DeKalb County.

50. At the polling place, the interpreter encountered significant difficulty trying to assist Mr. Kwon and his wife. The interpreter was asked to write her name on a form to indicate that she was assisting Mr. Kwon and to check a box to indicate that she was either a registered voter in the same precinct or a family member eligible under Subsection (b)(2). The interpreter tried to explain that Subsection (b)(2) did not apply to the November Election because there was a federal candidate on the ballot.

51. This dispute escalated from a poll worker to the poll manager to the poll manager's supervisor before it was finally resolved. The interpreter also used Advancing Justice-Atlanta's deputy director to help mediate the dispute. At one point during this protracted exchange, the poll manager instructed the Advancing Justice-Atlanta interpreter to ask Mr. Kwon in

Korean whether his English was proficient enough for him to vote without assistance. In the end, the poll worker allowed the interpreter to assist Mr. and Mrs. Kwon, but the confusion about the applicability of Subsection (b)(2) caused Mr. and Mrs. Kwon a fifteen to twenty minute delay in casting their votes.

**Advancing Justice-Atlanta's Preparation for the December Runoff and the Need for Injunctive Relief**

52. On December 4, there will be a statewide runoff election for the Georgia Secretary of State and the District 3 Public Service Commissioner (the "December Runoff") because no candidate in these races obtained more than 50% of the votes in the November Election. Since no federal candidate will appear on the ballot during the December Runoff, Subsection (b)(2) will significantly restrict whom LEP voters may choose to assist them with voting and creates the risk of disenfranchising LEP voters altogether.

53. Mr. Kwon's situation is illustrative. Subsection (b)(2) prohibits Mr. Kwon from receiving any assistance in the December Runoff from the Advancing Justice-Atlanta staff member who helped him and his wife in the November Election. In fact, Advancing Justice-Atlanta has three staff members who are fluent in Korean and trained to provide language assistance to LEP voters at the polls, but none are eligible under Subsection (b)(2) to assist Mr. Kwon in

the December Runoff. To date, neither Mr. Kwon nor Advancing Justice-Atlanta has been able to identify an interpreter who is permitted under Georgia law to assist Mr. Kwon with voting in the December Runoff.

54. Further, the chances of Mr. Kwon or Advancing Justice-Atlanta finding a person who meets the stringent criteria under Subsection (b)(2) are extremely slim. In Mr. Kwon's precinct, there are only 88 AAPI registered voters. Of those 88 AAPIs voters, none are guaranteed to be a Korean speaker. Asian Americans trace their roots to more than 20 different countries, each with its own unique languages. Indeed, 1,338 voting precincts in Georgia have 10 or less AAPI registered voters.[26]

55. Advancing Justice-Atlanta is currently engaging and will continue to engage in efforts to stem the negative impact that Subsection (b)(2) will have on LEP voters' ability to participate in the December Runoff. These efforts include: educating immigrant communities on who is permitted to provide language assistance to voters in the December Runoff; creating fliers and other materials to provide to voters, volunteers, and community partners; working with paid translation services to get these materials

---

[26] Information collected from "Active Voters by Race and Gender (By Congressional, State House & Senate, Judicial Districts and County Precinct)" link at http://sos.ga.gov/index.php/Elections/voter_registration_statistics.

translated into four different languages; distributing the materials via social media, text message, and email; recruiting multilingual volunteers who meet the much stricter criteria of Subsection (b)(2); and updating training material and re-training staff members and volunteers on the language assistance provisions of the State Statute.

56. All of these efforts require Advancing Justice-Atlanta to divert already limited financial and organizational resources toward minimizing the harmful effects that Subsection (b)(2) will have on AAPI communities. This leaves Advancing Justice-Atlanta with fewer resources to devote to its regular GOTV and election protection activities.

57. While Advancing Justice-Atlanta will assist LEP voters in the December Runoff where possible, Subsection (b)(2) cripples its ability to realistically meet the interpretation needs of LEP voters. Consequently, Advancing Justice-Atlanta must also divert resources to providing language assistance by other means that may be less effective or more costly, such as translating ballots.

58. Subsection (b)(2)'s restrictions also effectively foreclose Advancing Justice-Atlanta's ability to develop an effective interpreter program for the

Gwinnett County transit referendum in March 2019 and for all other future local and state races.

59. Furthermore, Subsection (b)(2) has thwarted, and will continue to thwart, Advancing Justice-Atlanta's mission of civically engaging historically marginalized communities by giving LEP voters the illusory choice between voting without any language assistance or foregoing the right to vote altogether.

## CAUSES OF ACTION

### COUNT ONE
**Violation of the Supremacy Clause and Section 208 of the Voting Rights Act**
**(52 U.S.C. § 10508)**

60. Plaintiffs reinstate and incorporate herein by reference the allegations in the paragraphs above.

61. The Supremacy Clause, Article VI, Section 2, of the United States Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

62. A state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" with regard to a federal law violates, and is preempted by, the federal law. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000).

63. Subsection (b)(2) imposes a limitation on voter choice that impermissibly conflicts with Section 208.

64. Whereas Section 208 of the VRA provides LEP Georgia voters with the right to select any assistor of their choice, subject only to certain employment-related limitations, Subsection (b)(2) narrowly restricts that choice to: (1) specifically enumerated family members, (2) care providers, and (3) registered voters in the same precinct as the LEP voter. This directly conflicts with the plain language of Section 208 and Congress's stated purpose of enacting it—to ensure that LEP voters have the right to an assistor of "their own choice," which ensures "meaningful voting assistance."

65. Therefore, Subsection (b)(2) violates, and is preempted by, Section 208.

## COUNT TWO
**Violation of the First and Fourteenth Amendments,
and 42 U.S.C. § 1983**

66. Plaintiffs reinstate and incorporate herein by reference the allegations in the paragraphs above.

67. The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right.  The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment.  *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (Virginia's poll tax violates the Equal Protection Clause); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983) (the right to vote is incorporated into the Due Process Clause).

68. By significantly restricting their ability to receive voting assistance from a person of their choice, Subsection (b)(2) imposes severe burdens on the fundamental right to vote for LEP and voters with disabilities in Georgia. Subsection (b)(2) further burdens the right to vote by limiting the number of LEP or voters with disabilities an individual interpreter may assist. These restrictions are not narrowly tailored to advance any state interest sufficiently compelling to justify the imposition of such severe burdens.

69. While the burdens of this process are undeniably severe, the process cannot pass muster even under the less restrictive *Anderson-Burdick* balancing test for more ordinary voting regulations. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs rights'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

70. There is no sufficient state interest justifying the restrictions of Subsection (b)(2) that is not adequately protected by other election procedures. According to the legislative history, the original purpose of the State Statute when it was enacted in 1922, long before the VRA was passed, was to "provide a secret and private ballot," presumably to protect voters from manipulation or coercion. Title VI Miscellaneous Civil and Penal Laws, Vol. 1, p. 101 (Laws 1922, Sec. 4, p. 97) (1922). Not only is this an insufficient state interest to justify the harsh restrictions of Subsection (b)(2), the interest is not realized by creating *more* barriers to using an interpreter of the LEP

voter's choice. In fact, disallowing LEP voters from choosing their interpreter makes them *more* vulnerable to manipulation, not less so.

71. By depriving Plaintiffs of these rights and privileges under the United States Constitution, Defendant Crittenden, acting under color of state law, has violated and is liable under 52 U.S.C. § 1983.

72. If enforcement of the statute is not enjoined, Subsection (b)(2) will continue to indefinitely impose severe burdens on the right to vote of Mr. Kwon and other similarly situated voters, requiring Advancing Justice-Atlanta to divert resources in an attempt to remedy the deprivation.

**COUNT THREE**

**Violation of Section 2 of the Voting Rights Act of 1965**

73. Plaintiffs reinstate and incorporate herein by reference the allegations in the paragraphs above.

74. Section 2 of the VRA, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group. Section 2 provides, in relevant part:

> (a)   No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

(b)   A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

75. Mr. Kwon, Asian Americans, and Hispanic and Latino Americans are members of a language minority group as defined under the VRA. *See* 52 USCS § 10310 (a "language minority group" under the VRA means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage).

76. Subsection (b)(2)'s restrictions on language assistance constitute a standard, practice, or procedure with respect to voting within the meaning of Section 2 of the VRA and result in the denial or abridgement of the right to vote of Asian Americans and Hispanic and Latino Americans on account of their membership in a language minority in violation of Section 2.

77. These restrictions impose a substantial, disparate, and unwarranted burden on Hispanic and Latino-American and Asian-American voters, as compared with other Georgia citizens who are not members of a language minority,

and deny them equal opportunity to meaningfully vote in Georgia state and local elections.

78. Subsection (b)(2)'s restrictions on language assistance interact with historical, social, and other electoral conditions in Georgia to prevent Hispanic and Latino-American and Asian American applicants from having an equal opportunity to effectively vote. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

79. In this case, the following circumstances are present: (1) a history of discrimination related to voting; (2) racially polarized voting patterns; (3) members of the impacted minority group are underrepresented among Georgia's elected officials; (4) majority vote requirements; and (5) a completely arbitrary policy that does not appear to serve any legitimate purpose.

80. As a result of Subsection (b)(2), and under the totality of the circumstances, Hispanic and Latino-American and Asian-American voters have an unequal opportunity, as compared to other members of the electorate, to participate in the political process and elect representatives of their choice.

81. Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Advancing Justice - Atlanta asks:

a. That this Court enter judgment in favor of Plaintiffs and against Defendant on the claims for relief as alleged in this Complaint;

b. That this Court issue a judgment declaring that O.C.G.A. § 21-2-409(b)(2) violates and is inconsistent with the provisions of Section 208 of the Voting Rights Act, 42 U.S.C. § 10508;

c. That this Court issue a judgment declaring that O.C.G.A. § 21-2-409(b)(2) violates the fundamental right to vote under the First and Fourteenth Amendments to the extent that it burdens the right of voters to receive assistance from persons of their choice at the polls;

d. That this Court grant preliminary and/or permanent injunctive relief by enjoining the enforcement of O.C.G.A. § 21-2-409(b)(2), and by ordering Defendant Crittenden, her employees, agents and successors, and all persons acting in concert with her, to undertake the following remedial actions:

    i. Enjoin enforcement of any county or state policy or practice that is in place that, on the basis of O.C.G.A. § 21-2-409(b)(2), denies voters the right to vote with the assistance of a person of their choice that

satisfies the minimal requirements of Section 208 of the Voting Rights Act, 52 U.S.C. § 10508;

ii.  Enjoin use of polling place forms that require voters and/or individuals assisting voters to indicate that they are complying with O.C.G.A. § 21-2-409(b)(2) before providing assistance;

iii.  Instruct all poll workers that O.C.G.A. § 21-2-409(b)(2) has been enjoined and that they must apply O.C.G.A. § 21-2-409(b)(1) regardless of whether or not there is a federal ballot on the candidate;

e.  That this Court retain jurisdiction over the Defendant and his successors for such period of time as may be appropriate to ensure compliance with relief ordered by this Court;

f.  That Plaintiff be awarded attorneys' fees and costs under  42 U.S.C. § 1988; and

g.  That the Court award any additional or alternative relief as may be appropriate under the circumstances.

Respectfully submitted, this 27th day of November, 2018.

                                         */s/ Daniel Huynh*
Deanna Kitamura                          Patrick J. Flinn, Esq.
dkitamura@advancingjustice-la.org        patrick.flinn@alston.com

CA Bar No. 162039
Nicole Gon Ochi
nochi@advancingjustice-la.org
CA Bar. No. 268678
Christopher Lapinig
clapinig@advancingjustice-la.org
CA Bar No. 802525
Eileen Ma
ema@advancingjustice-la.org
CA Bar No. 296800
(*pro hac vice* applications to be filed)
ASIAN AMERICANS ADVANCING
JUSTICE – LA
1145 Wilshire Blvd.
Los Angeles, CA 90017
Telephone: (213) 977-7500
Facsimile: (213) 977-7595

Phi Nguyen
GA Bar No. 578019
pnguyen@advancingjustice-atlanta.org
Hillary Li
GA Bar No. 898375
hli@advancingjustice-atlanta.org
ASIAN AMERICANS ADVANCING
JUSTICE – ATLANTA
5680 Oakbrook Parkway, Suite 148
Norcross, GA 30093
Telephone: (404) 585-8446

*Counsel for Plaintiffs*

Georgia Bar No. 264540
Daniel Huynh, Esq.
Daniel.huynh@alston.com
Georgia Bar No. 987369
David Gann, Esq.
david.gann@alston.com
Georgia Bar No. 940455
Nick Tsui
nick.tsui@alston.com
Georgia Bar No. 982502
Lindsay Church
Lindsay.church@alston.com
Georgia Bar No. 651190
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

Brian J. Sutherland, Esq.
bsutherland@buckleybeal.com
Georgia Bar No. 105408
BUCKLEY BEAL, LLP
600 Peachtree Street
Suite 3900
Atlanta, Georgia 105408
Tel.: (404 781-1100
Fax.: (404) 781-1101