**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

JIN KWON and ASIAN AMERICANS )
ADVANCING JUSTICE–ATLANTA, )
                                       )
       Plaintiffs, )     CIVIL ACTION
                                         )     FILE NO.
v. )
                                         )
ROBYN A. CRITTENDEN, SECRETARY )  **EXPEDITED TREATMENT**
OF STATE OF GEORGIA, )  **REQUESTED**
                                         )
      Defendant._____ )

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY**</u>
<u>**MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ...............................................................................2

I. SECTION 208 OF THE VRA ENTITLES LEP VOTERS TO RECEIVE ASSISTANCE FROM THE PERSON OF THEIR CHOICE ............................2

II. SUBSECTION (B)(2) IMPERMISSIBLY RESTRICTS LEP VOTERS' CHOICE OF ASSISTANCE ...................................................................3

III. DURING THE NOVEMBER 6, 2018 ELECTION, POLL WORKERS ATTEMPTED TO ENFORCE SUBSECTION (B)(2), EVEN THOUGH IT DID NOT APPLY ........................................................................5

    A. Subsection (b)(2) Causes Harm to Plaintiff Advancing Justice-Atlanta's Mission of Protecting the Civil Rights of LEP Voters ...................................5

    B. Subsection (b)(2) Impermissibly Restricts the Choice of Interpreters for Plaintiff Jin Kwon and Other LEP Voters ......................................7

ARGUMENT .....................................................................................................8

I. PLAINTIFFS HAVE STANDING TO REQUEST INJUNCTIVE RELIEF ....9

    A. Mr. Kwon Has Standing ................................................................9

    B. Advancing Justice-Atlanta Has Standing ....................................10

II. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF COUNTS ONE AND TWO .........................................................12

    A. Subsection (b)(2) Plainly Conflicts With—And Is Therefore Preempted By—Section 208 of the VRA .......................................................12

B.   Plaintiffs Are Substantially Likely to Succeed on the Merits of Count Two ...................................................................................................15

i.   The *Anderson-Burdick* Test Applies Here.................................17

ii.   Subsection (b)(2) Severely Burdens the Right to Vote ............................18

iii.   Subsection (b)(2)'s Restrictions Are Unjustified ....................................20

II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM, ABSENT INJUNCTIVE RELIEF ........................................................................21

III.   INJUNCTIVE RELIEF WILL IMPOSE MINIMAL, IF ANY, BURDENS ON DEFENDANTS ...........................................................................23

IV.   ENTRY OF RELIEF WOULD FAVOR THE PUBLIC INTEREST.............24

CONCLUSION ....................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)........................................................................16, 17

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ...........................................................9, 10

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S 1 (2013).....................................................................................12

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................................12

*Burdick v. Takushi*,
    504 U.S. 428 (1992)...........................................................................17, 20

*Casarez v. Val Verde Cnty.*,
    957 F. Supp. 847 (W.D. Tex. 1997) ........................................................24

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    324 F. Supp. 2d 1358 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir.
    2005) .....................................................................................................22

*Charles H. Wesley Educ. Found. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ..........................................................9, 24

*Cotham v. Garza*,
    905 F. Supp. 389 (S.D. Tex. 1995).........................................................21

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)...................................................................18, 19, 20

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................................12

*Cruz v. Ysleta Del Sur Tribal Council*,
    842 F. Supp. 934 (W.D. Tex. 1993) ........................................................14

*Dillard v. Crenshaw Cnty.*,
  640 F. Supp. 1347 (M.D. Ala. 1986) ....................................................22

*Fla. State Conf. of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) .........................................................9, 10

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).............................................................................10

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)...............................................................................12

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018) .....................16, 17, 18, 19

*Madera v. Detzner*,
  325 F. Supp. 3d 1269, 1279 (N.D. Fla. 2018) ...........................16, 22, 25

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ..............................................................22

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ......................................................3, 15, 16

*OCA-Greater Houston v. Texas*,
  No. 1:15-CV-00679-RP, 2016 WL 9651777 (W.D. Tex. Aug. 12,
  2016) ................................................................................................3, 14

*Puerto Rican Org. for Political Action v. Kusper*,
  490 F.2d 575 (7th Cir. 1973) ..........................................................16, 19

*Reynolds v. Sims*,
  377 U.S. 533 (1964)..............................................................................9

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) ..........................................................22

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966), *abrogated on other grounds by Shelby Cnty. v.
  Holder*, 570 U.S. 529 (2013) ...............................................................13

*Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*,
  388 F.3d 547 (6th Cir. 2004) ...................................................................9

*Taylor v. Louisiana*,
  419 U.S. 522 (1975)..........................................................................24

*United States v. Berks Cnty.*,
  250 F. Supp. 2d 525 (E.D. Pa. 2003).........................................24, 25

*United States v. Berks Cnty.*,
  277 F. Supp. 2d 570 (E.D. Pa. 2003) ...............................................3

*United States v. Metro. Dade Cnty.*,
  815 F. Supp. 1475 (S.D. Fla. 1993) ..................................................14

*Uvalde Consol. Indep. Sch. Dist. v. United States*,
  451 U.S. 1002 (1981)........................................................................16

*Windsor v. United States*,
  379 F. App'x. 912 (11th Cir. 2010) ....................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................8

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886).........................................................................15

## FEDERAL STATUTES

42 U.S.C. § 1973(b)(f)(1) .......................................................................3

42 U.S.C. § 1973aa-6 ...........................................................................14

52 U.S.C. § 10503(a)-(b) ........................................................................2

## STATE STATUTES

1922 Ga. Laws 97 .................................................................................21

Ga. Code § 21-2-409 ...............................................................................3

Ga. Code § 21-2-409(b)(2) ...........................................................1, 4, 20

Tex. Elec. Code § 61.033 ...........................................................................15

**RULES**

Federal Rule of Civil Procedure 65 ...............................................................8

**OTHER AUTHORITIES**

127 CONG REC. H7001 (daily ed. Oct. 5, 1981) ..........................................13

128 CONG. REC. H3839-46 (daily ed. June 23, 1982) ..................................13

H.R. REP. NO. 102-655 (1992)........................................................................3

S. REP. NO. 97-417 (1982) ..............................................................3, 13, 14

# INTRODUCTION

The right to vote is the most cherished right in our democracy. Yet, for hundreds of thousands of Limited English Proficient ("LEP") voters in Georgia, that right is threatened because they lack the language assistance they need to meaningfully participate in the electoral process. Georgia does not translate election materials in any language other than Spanish in Gwinnett County, leaving the majority of LEP voters in Georgia dependent on assisters who can help them vote effectively. However, Section 21-2-409(b)(2) of the Georgia Code ("Subsection (b)(2)") severely limits who can provide language assistance to Georgia's LEP voters, abridging fundamental constitutional rights and running afoul of Section 208 of the federal Voting Rights Act of 1965, 52 U.S.C. § 10508 (the "VRA"), which imposes far fewer restrictions on whom LEP voters can bring to the polls to help them vote. With the December 4, 2018 runoff elections (the "December 4 Runoff") in Georgia around the corner and early voting for the Runoff already underway, it is urgent that this Court enjoin Subsection(b)(2) to protect LEP voters and safeguard their right to vote.

Injunctive relief is imperative because Subsection (b)(2) impacts high portions of Asian American, Latino, and other immigrant communities in Georgia that are LEP. Specifically, approximately 36% of the Asian American community and 38% of

1

the Latino community speaks English less than "very well."[1] Section 208 and other provisions of the VRA recognize that when LEP voters are denied meaningful language assistance, they are also robbed of the meaningful opportunity to vote. *See* 52 U.S.C. § 10503(a)-(b) (congressional findings that language minorities have been effectively excluded from participation in the electoral process). Subsection (b)(2) creates illegal obstacles for thousands of voters from historically marginalized language-minority communities and jeopardizes the right to vote of a significant portion of the state's electorate.

Based on strong evidence from the recent November 6, 2018 Election (the "November Election"), Plaintiffs Jin Kwon and Asian Americans Advancing Justice–Atlanta ("Advancing Justice-Atlanta") (collectively, "Plaintiffs") seek injunctive relief to stop the Secretary of State (the "Defendant") from implementing Subsection (b)(2) during the December 4 Runoff.

## FACTUAL BACKGROUND

## I.   SECTION 208 OF THE VRA ENTITLES LEP VOTERS TO RECEIVE ASSISTANCE FROM THE PERSON OF THEIR CHOICE

Section 208 provides that an LEP voter may receive assistance in voting from *any* person of the voter's choice, except for the voter's employer or union. *See* 52

---

[1] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates Tables B16001, B16006.

U.S.C. § 10508 ("Any voter who requires assistance to vote . . . may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."). "The goal [of Section 208] is to afford blind, disabled, and limited-English proficient voters 'the same opportunity to vote enjoyed by all citizens.'" *OCA-Greater Houston v. Texas*, No. 1:15-CV-00679-RP, 2016 WL 9651777, at *9 (W.D. Tex. Aug. 12, 2016) (quoting S. REP. NO. 97-417, at 62 (1982)), *aff'd*, 867 F.3d 604 (5th Cir. 2017).

Congress enacted Section 208 and other language-access provisions of the VRA recognizing that "voting discrimination against citizens of [language] minorities is pervasive and national [in] scope." *United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003) (citing 42 U.S.C. § 1973(b)(f)(1)). In reauthorizing the language-access provisions of the VRA in 1992, Congress reasoned that, "without a federal mandate, much needed bilingual assistance in the voting process, meant to ensure the guarantees of the Fourteenth and Fifteenth Amendments, may disappear." H.R. REP. NO. 102-655, at 3 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 766, 767.

## II.   SUBSECTION (B)(2) IMPERMISSIBLY RESTRICTS LEP VOTERS' CHOICE OF ASSISTANCE

Section 21-2-409 of the Georgia Code (the "State Statute") imposes several restrictions on an LEP voter's ability to choose his or her interpreter. These restrictions appear nowhere in the VRA. Conspicuously, the State Statute mandates

3

two different sets of requirements: one set for elections where a federal candidate appears on the ballot and another set for non-federal elections. In elections where at least one federal candidate appears on the ballot, the State Statute mirrors Section 208. By contrast, in elections in which there are no federal candidates on the ballot, Subsection (b)(2) provides, *inter alia*:

1. The voter may *only* receive assistance in voting from either (a) another registered voter who is a resident of the same precinct or (b) a relative or attendant care provider;

2. An individual may only provide voting assistance to a maximum of ten voters in any given election (i.e., a voter may not receive assistance from an individual who has already assisted ten other voters in the same election).

O.C.G.A. § 21-2-409(b)(2). The State Statute provides no explanation for the imposition of these two different sets of requirements. As the December 4 Runoff does not have any federal candidates on the ballot, Subsection (b)(2) will apply, restricting LEP voters' choice of assistance. For example, LEP voters like Mr. Kwon availed themselves of Advancing Justice-Atlanta's language assistance program when they voted on November 6 for the Secretary of State's office (among other offices), but will not—due to Subsection (b)(2)—be able to use that program to vote on December 4 in the runoff election.

**III.   DURING THE NOVEMBER 6, 2018 ELECTION, POLL WORKERS ATTEMPTED TO ENFORCE SUBSECTION (B)(2), EVEN THOUGH IT DID NOT APPLY**

Subsection (b)(2) did not apply to the November Election because every ballot contained at least one federal candidate. Nevertheless, as described further below, some poll workers mistakenly attempted to enforce these restrictions, causing delays and confusion for LEP voters and organizations assisting LEP voters, such as Plaintiffs.

**A.   Subsection (b)(2) Causes Harm to Plaintiff Advancing Justice-Atlanta's Mission of Protecting the Civil Rights of LEP Voters**

Advancing Justice-Atlanta is a nonpartisan organization that conducts civic engagement activities, including voter education and Get Out The Vote ("GOTV") efforts, in multiple languages, including Spanish, Vietnamese, Korean, and Chinese. Declaration of Karuna Ramachandran ("Ramachandran Decl."), ¶¶ 3, 6, 9. During the November Election, it also ran a language assistance program for LEP voters. *Id.* at ¶ 10. For this program, Advancing Justice-Atlanta recruited and trained bilingual staff members and volunteers to assist LEP voters at the polls during early voting and on Election Day. *Id.* at ¶ 11. As part of their training, Advancing Justice-Atlanta educated interpreters about relevant language assistance laws, including Section 208 and the State Statute. *Id.* at ¶ 16. Even though Subsection (b)(2) did not apply in the November Election, interpreters were advised of it, in case poll workers were unclear

or misinformed about its applicability. *Id.* But the fact that poll workers attempted to enforce Subsection (b)(2) in an election in which it did not even apply removes any doubt that LEP voters will again suffer the same undue burdens in the upcoming December 4 Runoff, in which no federal candidate is on the ballot. *Id.* at ¶ 20.

Through Advancing Justice-Atlanta's language assistance program, interpreters—all of whom met the criteria for providing assistance under state and federal law—assisted over 25 LEP voters. *Id.* at ¶ 18. However, had the November Election not included any federal candidates, Subsection (b)(2) would have prevented the vast majority of these LEP voters from receiving assistance from Advancing Justice-Atlanta interpreters. *Id.* Although Advancing Justice-Atlanta plans to provide language assistance to LEP voters in the December 4 Runoff, Subsection (b)(2) significantly hampers its ability to run an effective language assistance program in any non-federal election. Because Subsection (b)(2) applies in the December 4 Runoff, Advancing Justice-Atlanta must attempt to recruit as interpreters voters who are registered in the same precinct as the LEP voters requiring assistance. *Id.* at ¶ 25. Given the near impossibility of this task, Advancing Justice-Atlanta is also investing resources in educating LEP voters about their limited choices for assistance in the December 4 Runoff, and providing alternative means of language assistance, such as translated ballots. *Id.* at ¶ 22.

**B.     Subsection (b)(2) Impermissibly Restricts the Choice of Interpreters for Plaintiff Jin Kwon and Other LEP Voters**

Individual voters like Plaintiff Mr. Jin Kwon will certainly be denied the right to vote if Subsection (b)(2) is enforced. Mr. Kwon is one of the LEP voters who had difficulty obtaining assistance due to poll worker confusion about how the State Statute applied in the November Election. Declaration of Jin Kwon ("Kwon Decl."), ¶ 8. Mr. Kwon is a 65-year-old LEP voter who resides in DeKalb County with his wife, who is also an LEP Korean speaker. *Id.* at ¶¶ 2-3. Mr. Kwon contacted Advancing Justice-Atlanta to request language assistance in the November Election after seeing these services advertised on Korean television. *Id.* at ¶ 5. On Election Day, an Advancing Justice-Atlanta staff member accompanied him and his wife to their precinct to serve as their interpreter. *Id* at ¶ 7. The staff member was not a registered voter in Mr. Kwon's precinct. *Id.* at ¶ 14. At the precinct, the poll manager initially prevented the interpreter from assisting Mr. and Mrs. Kwon, erroneously relying on Subsection (b)(2). *Id.* at ¶ 14. The interpreter explained to the poll manager that, as there were federal candidates on the ballot, Subsection (b)(2) did not apply. *Id.* at ¶ 10. There was a ten to fifteen minute delay while poll workers debated if Subsection (b)(2) applied. Declaration of Grace Ahn ("Ahn Decl."), ¶ 10; Kwon Decl. at ¶ 10. The issue was escalated up to the poll manager's supervisor and the deputy

director of Advancing Justice-Atlanta before the interpreter was finally allowed to assist Mr. Kwon and his wife.  Kwon Decl. at ¶¶ 8-11; Ahn Decl. at ¶¶ 11-12.

Mr. Kwon has been a U.S. citizen for approximately eight years and a registered voter for several years, but he feels intimidated by voting due to his limited English proficiency. Kwon Decl. at ¶¶ 3, 16-17. He believes that there are many other elderly Korean immigrants who face the same barrier to voting.  *Id.* at ¶ 18. Mr. Kwon has few options for obtaining language assistance at the polls, as his children live out of state and he does not know any bilingual Korean speakers who are registered voters in his precinct. *Id.* at ¶¶ 6, 15.

## ARGUMENT

Plaintiffs urgently seek, pursuant to Federal Rule of Civil Procedure 65, to enjoin elections officials from implementing Subsection (b)(2) during the December 4 Runoff and any other Georgia election during this action's pendency.

A temporary restraining order ("TRO") is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that an injunction would not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Windsor v. United States*, 379 F.

8

App'x. 912, 916-17 (11th Cir. 2010) (noting that the four criteria for obtaining a TRO are identical to those for issuance of a preliminary injunction).

As discussed below, Plaintiffs are substantially likely to succeed on the merits of Counts One and Two of the Complaint, and the remaining temporary restraining order and preliminary injunction factors are satisfied in this case.

## I.   PLAINTIFFS HAVE STANDING TO REQUEST INJUNCTIVE RELIEF

### A.   Mr. Kwon Has Standing

Both voters who have been disenfranchised by state action, as well as those who have not been "wholly denied" the franchise, have standing to request injunctive relief. *Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ["*Wesley*"]. "Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Id.*   For example, as here, "greater delay and inconvenience in voting" caused by a state law is sufficient to confer standing. *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004); *accord Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")

"When the harm alleged is prospective, . . . a plaintiff can satisfy the injury-in-fact requirement by showing imminent harm." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (citing *Fla. State Conf. of the NAACP v. Browning*, 522

F.3d 1153, 1160-61 (11th Cir. 2008)). "While the threatened future injury cannot be merely hypothetical . . . , probabilistic harm is enough." *Id.*

Here, Mr. Kwon has shown that he has already suffered delays and confusion resulting from the State Statute during the November Election—even though Subsection (b)(2) did not apply. Furthermore, as the Subsection (b)(2) will severely restrict Mr. Kwon's access to language assistance in the December 4 Runoff, Mr. Kwon is likely to suffer even greater harm—including effective disfranchisement—in the imminent future and in subsequent elections. Mr. Kwon therefore has standing to request injunctive relief.

### B.    Advancing Justice-Atlanta Has Standing

"[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Browning*, 522 F.3d at 1165 (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982)). In the voting rights context, an organization has standing where it "reasonably anticipate[d] that [it] [would] have to divert personnel and time to educating volunteers and voters on compliance with . . . voting requirements." *Billups*, 554 F.3d at 1350.

Advancing Justice-Atlanta regularly engages in voter education, registration, and other civic engagement activities, with a particular focus on communities that have significant LEP populations. As in *Billups*, Advancing Justice-Atlanta has

diverted and will continue to "divert substantial time and resources from its regular activities to educate voters about the requirement[s of the State Statute] and assist voters in obtaining language assistance, and recruit bilingual volunteer interpreters who meet the much stricter criteria for providing interpretation services." Ramachandran Decl. at ¶ 25.

Specifically, Advancing Justice-Atlanta has diverted, and continues to divert, time and resources toward educating community members on who is permitted to provide language assistance to voters in the runoff, through multilingual text blasts, modifications to our canvassing scripts, social media, and communications newsletters; creating digital communications to be dispersed on social media and drafting a text message to be sent to LEP voters to educate them about this issue; getting those communications translated into various languages with the help of paid translation services; distributing these communications through paid text message services, on social media and through partners to reach diverse community groups and voters, including Latino and other immigrant communities; and re-training staff members and volunteers on the language assistance provisions under state and federal law. *Id.* at ¶ 22.

This will leave Advancing Justice-Atlanta "with fewer resources to devote to its regular GOTV, election protection, and other activities." *Id.* at ¶ 25. Advancing Justice-Atlanta therefore has standing on its own behalf to request injunctive relief.

## II.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF COUNTS ONE AND TWO

Plaintiffs are substantially likely to succeed on the merits of Counts One and Two, as Subsection (b)(2) is preempted by the VRA and violates Plaintiffs' rights under the U.S. Constitution and the VRA.

### A.   Subsection (b)(2) Plainly Conflicts With—And Is Therefore Preempted By—Section 208 of the VRA

Subsection (b)(2) clearly conflicts with Section 208 of the VRA. "[S]tate laws are pre-empted when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). A state law is preempted, *inter alia*, when it "stands as an obstacle to the accomplishment and execution of the full purposes of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). A state law creates such an obstacle when it imposes additional restrictions not supported by federal law. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19-20 (2013) (holding that a federal law, which requires states to "accept and use" a uniform federal voter registration form, precluded Arizona from requiring additional documentary proof); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (whether a state law creates an unconstitutional obstacle is "informed by examining the federal statute as a whole and identifying its purpose and intended effects").

Subsection (b)(2)'s restriction on assistance for language minority voters thwarts the purpose of Section 208. "The Voting Rights Act was designed by

Congress to banish the blight of racial discrimination in voting . . . ." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), *abrogated on other grounds by Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

Since its original passage in 1965, the VRA has been repeatedly renewed and amended to address vestiges of slavery-era racial discrimination and other forms of voting discrimination. In 1975, Congress expanded the VRA to protect language minorities and included in its definition of impermissible election "tests" or "devices" the use of English-only election materials in certain jurisdictions with sufficiently numerous language minority populations. S. REP. NO. 97-417, at 8-9 (1982). This expansion of the VRA has resulted in increased voter participation among LEP voters and other language minorities. *See* Bernard L. Fraga & Julie Lee Merseth, *Examining the Causal Impact of the Voting Rights Act Language Minority Provisions,* 1 THE J. OF RACE, ETHNICITY, AND POLITICS 31-59 (2016).

In 1982, Section 208 was added to the VRA. "Voting Rights Act Amendments of 1982," Pub. L. No. 97-205, 96 Stat. 131 (1982). Congress added Section 208 to ensure equal access to the polls and to "limit risks of discrimination against voters [in need of assistance] and avoid denial or infringement of their right to vote." 128 CONG. REC. H3839-46 (daily ed. June 23, 1982); S. REP. NO. 97-417, at 62 (1982). Congress designed Section 208 to preserve the privacy and secrecy of each individual's vote. 127 Cong Rec. H7001 (daily ed. Oct. 5, 1981) (Fenwick Amendment). Congress

13

concluded that "the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter" was to guarantee that voters "be permitted to have the assistance of a person of their own choice," a person whom the voter trusts. S. REP. NO. 97-417, at 62 (1982). Section 208's legislative history notes that any "state provisions would be preempted [if] they unduly burden the right" established by Section 208. *Id.* at 63.

The State Statute's language suggests that its drafters were at least aware that its additional restrictions conflicted with Section 208, resulting in the peculiar distinction between federal and non-federal elections. But the VRA, including Section 208, applies in equal force to *all* elections, federal or otherwise. *See Cruz v. Ysleta Del Sur Tribal Council*, 842 F. Supp. 934, 935 (W.D. Tex. 1993) ("The Voting Rights Act by its own terms applies to any election in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision.") (citing 42 U.S.C. § 1973aa-6 [former Section 208]); *United States v. Metro. Dade Cnty.,* 815 F. Supp. 1475, 1476 (S.D. Fla. 1993) (discussing injunctive relief concerning county election under Section 203).  Therefore, the State Statute cannot override the VRA in any election.

Indeed, the Fifth Circuit recently affirmed, in substantial and relevant part, an injunction barring the enforcement of a Texas statute that bears an uncanny resemblance to the State Statute here. In *OCA-Greater Houston v. Texas*,

14

organizational and individual plaintiffs challenged a provision of the Texas Election Code that required interpreters assisting LEP voters at the polls to "be a registered voter of the county in which the voter needing interpreting resides." 867 F.3d 604, 608 (5th Cir. 2017) (quoting Tex. Elec. Code § 61.033). The Fifth Circuit agreed with the district court that this statute was preempted by Section 208, reasoning that the Texas statute "imposes a limitation on voter choice unsupported by, and therefore in conflict with, Section 208 [of the VRA]." *Id.* at 614. The injunction made no distinction between federal and non-federal elections; the Texas statute could not be lawfully enforced in *any* election.

Subsection (b)(2) creates similar restrictions "unsupported by, and therefore in conflict with, Section 208." This Court should therefore bar its enforcement.

### B.   Plaintiffs Are Substantially Likely to Succeed on the Merits of Count Two

Plaintiffs are also substantially likely to succeed on the merits of Count Two because Subsection (b)(2) impermissibly burdens the fundamental right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

Voting is a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Courts have long held that the right to vote includes not only the right to physically enter a polling place and fill out a ballot but also the right to comprehend and understand what is on that ballot."

*Madera v. Detzner*, 325 F. Supp. 3d 1269, 1279 (N.D. Fla. 2018); *accord OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017). Thus, the right to vote "encompasses the right to an *effective* vote." *Id.* (quoting *Puerto Rican Org. for Political Action v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973)). The right to vote is thus protected by the Due Process Clause of the Fourteenth Amendment. *See Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

Voting in a language one does not understand is "ineffective." *Madera*, 325 F. Supp. 3d at 1279. In other words, the "right to vote," as guaranteed by the Fourteenth Amendment and the VRA, "entitle[s LEP voters] to assistance in the language [they] can read or understand." *Kusper*, 490 F.2d at 580; *accord Uvalde Consol. Indep. Sch. Dist. v. United States*, 451 U.S. 1002, 1004 (1981) ("Congress, pursuant to its authority to enforce the guarantees of the Fourteenth Amendment, extended [the VRA] to protect the right to vote of linguistic minorities . . . .")

Creating a "second class of voters" by subjecting an identifiable group of voters to heightened burdens is "constitutionally untenable." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018). Accordingly, courts have developed a balancing test to prevent unjustified burdens on the right to vote, which Subsection (b)(2) fails.

### i.      The *Anderson-Burdick* Test Applies Here

A state may not place any burdens on the right to vote that are not adequately justified by the state's asserted interests. *Anderson*, 460 U.S. at 780; *Burdick v. Takushi,* 504 U.S. 428 (1992). When considering challenges to state election laws that impact the fundamental right to vote, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Anderson*, 460 U.S. at 789.

The *Anderson-Burdick* framework is a "flexible" sliding scale, in which the "rigorousness of [the court's] inquiry" increases with the severity of the burden. *Burdick*, 504 U.S. at 434. When a state imposes a severe burden, strict scrutiny applies, and any burden must be narrowly tailored to advance a compelling state interest. *Id.* An election regulation constitutes a "severe" restriction on the fundamental right to vote when that regulation "categorically" burdens the ability of an identifiable class of voters to take actions necessary to vote successfully. *See, e.g.*, *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1219 (distinguishing "disparate inconveniences" from "denial or abridgement" because the regulation in question "categorically prohibited" on-campus voting). Even where the burden is not "severe" enough to warrant strict scrutiny, a state must still advance an "important regulatory

17

interest" to justify the restriction on the right to vote. *Id.* at 1215. "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008)).

### ii.     Subsection (b)(2) Severely Burdens the Right to Vote

Subsection (b)(2) severely burdens the right to vote of LEP voters. LEP voters who cannot find an interpreter that meets the stringent requirements to serve as an assister in non-federal elections will either be forced to vote in a language they do not sufficiently understand without any assistance, or they may choose to forego their right to vote altogether. Mr. Kwon's case is a clear example of the harsh consequences of these restrictions. As he has no bilingual family or "attendant care taker" in the state, the only option that remains for Mr. Kwon under Subsection (b)(2), then, is to find a person who is: (1) a registered voter in the *same precinct* as him; (2) is fluent in Korean and English; *and* (3) is willing and available to assist him at the polls. The chances of Mr. Kwon finding a person who meets these exacting criteria are extremely slim, especially given the fact that there are only 88 Asian voters in his precinct.[2] Thus, Subsection (b)(2)—if not enjoined—will effectively deprive Mr. Kwon of the

---

[2] Further, 1,338 voting precincts in Georgia have 10 or less AAPI registered voters—pulled from the "Active Voters by Race and Gender (By Congressional, State House & Senate, Judicial Districts and County Precinct)," *available at* http://sos.ga.gov/index.php/Elections/voter_registration_statistics.

right to receive language assistance at the polls, which in turn will effectively deny him the right to vote. *See Kusper*, 490 F.2d at 580.

And Mr. Kwon is certainly not the only LEP voter injured by Subsection (b)(2) in this manner. Indeed, the majority of LEP voters whom Advancing Justice-Atlanta interpreters assisted in the November Election are individuals whom Subsection (b)(2) prohibits the interpreters from assisting in non-federal elections. Ramachandran Decl. at ¶ 23.

Further, the State Statute disproportionately burdens voters of color, and "[d]isparate impact matters" when evaluating the burden under the *Anderson-Burdick* test. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216-17 ("A majority of the *Crawford* Court determined that "[i]t 'matters' in the *Anderson-Burdick* analysis . . . whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups."). The State Statute has a disparate impact on voters of color. While only 5.6% percent of the general population of Georgia is LEP, 36% percent of Asian Americans and 38% of Latinos in Georgia are LEP.[3] By contrast, less than 1% of non-Hispanic White residents speak English less than "very well."[4]

---

[3] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates Tables B16001, B16006.
[4] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Table B16005H.

### iii.     Subsection (b)(2)'s Restrictions Are Unjustified

The severe burden that Subsection (b)(2) places on the right to vote in non-federal elections demands strict scrutiny by this Court. However, the statute's restrictions on a voter's choice of and ability to receive assistance are so unrelated to any state interest that they would not pass the *Anderson-Burdick* test, even under the most lenient scrutiny. *See Burdick*, 504 U.S. at 434. Even where a regulation creates a slight burden, the state must show that a relevant state interest justifies the regulation. *Crawford*, 553 U.S. at 191 (2008).

Under the State Statute, the degree of language access an LEP voter is afforded turns *solely* on whether an election includes a federal candidate. And the disparity in the degree of access is tremendous. In federal elections, the universe of persons who can assist LEP voters at the polls is expansive; the only people excluded from serving as an assister are the voter's employer or union. In non-federal elections, by contrast, LEP voters are confined to an extremely small pool of eligible interpreters: statutorily specified family members, an "attendant care taker," or a registered voter in the same precinct. *See* O.C.G.A. § 21-2-409(b)(2). In many cases, such as Mr. Kwon's, there is virtually no one who is permitted to help him vote on December 4.  There is also no guarantee that a LEP voter can find an individual who would satisfy any of these requirements, and Subsection (b)(2) provides no safeguards for ensuring that LEP voters receive needed assistance.

20

Additionally, according to the legislative history of the State Statute, the original purpose when it was enacted in 1922, long before the VRA was passed, was to "provide a secret and private ballot," presumably to protect voters from manipulation or coercion. 1922 Ga. Laws 97. Not only is this an insufficient state interest, the interest is not realized by creating *more* barriers to using an interpreter of the LEP voter's choice. In fact, disallowing LEP voters from choosing their interpreter makes them *more* vulnerable to manipulation, not less so.

Given both the severity of the burden that Subsection (b)(2) places on the right to vote—and the lack of any state interest justifying this burden—Plaintiffs are substantially likely to succeed on the merits of Count Two. *See Cotham v. Garza*, 905 F. Supp. 389, 400–01 (S.D. Tex. 1995) (applying *Anderson-Burdick* and enjoining a state law prohibiting use of written materials in voting booths because the state had "failed to present any evidence demonstrating that the restrictions" were necessary to advance any legitimate state interests).

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM, ABSENT INJUNCTIVE RELIEF

As discussed *supra*, the right to vote is a fundamental right guaranteed by the Fourteenth Amendment and the VRA. For this reason, the denial of the effective right to vote that will occur if the Secretary is permitted to continue enforcing Subsection (b)(2) constitutes irreparable injury.

Indeed, "irreparable injury is presumed when '[a] restriction on the fundamental right to vote' is at issue." *Id.* at 1282 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). "An injury is irreparable if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (internal quotation marks omitted). "It is simply not possible to pay someone for having been denied a right of this importance," and therefore, monetary remedies "would obviously be inadequate." *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).

As a result, courts routinely recognize that state actions that infringe upon the right to vote constitute irreparable injury for injunctive relief purposes. *See, e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (irreparable harm found where defendant refused to accept plaintiff voter's registration in her precinct of residence, preventing her from voting), *aff'd*, 408 F.3d 1349 (11th Cir. 2005).

Subsection (b)(2) threatens to render LEP voters' votes ineffective, abridging their "right to comprehend and understand what is on that ballot." *Madera*, 325 F. Supp. 3d at 1279. If Subsection (b)(2) is implemented during the December 4 Runoff, Mr. Kwon and other LEP voters will be deprived of the language assistance that federal law guarantees them. As discussed *supra*, LEP voters like Mr. Kwon frequently have few options for obtaining language assistance at the polls. *See supra*

22

at Section (III)(B). Subsection (b)(2) unnecessarily limits their choices even further, to the extent that at least some LEP voters will be left with no options for obtaining language assistance at all. Kwon Decl. at ¶¶ 5-6, 15. LEP voters, intimidated by casting their votes in a language they do not understand and their inability to bring an interpreter of their choice, will be increasingly deterred from voting in every election that Subsection (b)(2) is applied. Early voting is already open for the December 4 Runoff, but once the polls close, LEP voters' opportunity to exercise their right to an effective vote for this election will be lost forever.

Furthermore, Advancing Justice-Atlanta has already expended and will continue to expend considerable resources, including paid and volunteer staff time it would otherwise devote to other activities. Advancing Justice-Atlanta will be forced to devote its time and limited resources to educating voters about the State Statute, attempting to recruit interpreters that satisfy Subsection (b)(2)'s restrictions, and providing language assistance to the extent the State Statute permits it to. Advancing Justice-Atlanta, too, then, will suffer irreparable harm.

## III.   INJUNCTIVE RELIEF WILL IMPOSE MINIMAL, IF ANY, BURDENS ON DEFENDANTS

The requested relief would place minimal, if any, burdens on Defendant, and in any event, any burden imposed on Defendant is "far outweighed by the fundamental

right at issue." *Berks Cnty.*, 250 F. Supp. 2d at 541; *accord Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

In fact, the requested relief merely requires the Defendant to implement the policies and practices that they are supposed to—but did not—implement during the November Election, in which a federal candidate was on the ballot. Thus, Defendant is already well situated to comply with the requested injunctive relief. Injunctive relief will actually *lessen* the administrative burdens for Defendant, as Section 208 creates fewer restrictions to enforce than Subsection (b)(2) does. Plaintiffs request that Defendant comply with Section 208 in *all* elections, including the December 4 Runoff, not just elections where a federal candidate appears on the ballot, even though Defendant has not complied with the law in the most recent election of that kind anyway.

## IV.   ENTRY OF RELIEF WOULD FAVOR THE PUBLIC INTEREST

"[T]he protection of 'franchise-related rights is without question in the public interest.'" *Fayette Cnty.*, 118 F. Supp. 3d at 1349 (quoting *Cox*, 308 F.3d at 1355). Plaintiffs' requested injunctive relief would protect the franchise-related rights of LEP voters. Furthermore, the requested injunctive relief would serve the public interest because it would bolster public confidence in the election process. *See Casarez v. Val Verde Cnty.*, 957 F. Supp. 847, 865 (W.D. Tex. 1997) ("The public must have confidence that the election process is fair." (ellipses omitted)).

24

"Additionally, state and local officials serve the public interest when they conform their conduct to federal law's requirements." *Madera*, 325 F. Supp. 3d at 1283; *see also United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("Ordering Defendants to conduct elections in compliance with the Voting Rights Act so that all citizens may participate equally in the electoral process serves the public interest by reinforcing the core principles of our democracy.")

## CONCLUSION

Subsection (b)(2), in conflict with the clear mandate of federal law, abridges LEP voters' right to cast effective votes in the December 4, 2018 runoff elections. For the foregoing reasons, Plaintiffs respectfully request that the Court order the relief detailed in Plaintiffs' accompanying motion for injunctive relief and proposed order.

Respectfully submitted, this 27th day of November, 2018.

*/s/Daniel Huynh*

| | |
|---|---|
| Deanna Kitamura | Patrick J. Flinn, Esq. |
| dkitamura@advancingjustice-la.org | patrick.flinn@alston.com |
| CA Bar No. 162039 | Georgia Bar No. 264540 |
| Nicole Gon Ochi | Daniel Huynh, Esq. |
| nochi@advancingjustice-la.org | Daniel.huynh@alston.com |
| CA Bar. No. 268678 | Georgia Bar No. 987369 |
| Christopher Lapinig | David Gann, Esq. |
| clapinig@advancingjustice-la.org | david.gann@alston.com |
| CA Bar No. 802525 | Georgia Bar No. 940455 |
| Eileen Ma | Nick Tsui |
| ema@advancingjustice-la.org | nick.tsui@alston.com |
| CA Bar No. 296800 | Georgia Bar No. 982502 |
| (*pro hac vice* applications to be filed) | Lindsay Church |

25

ASIAN AMERICANS ADVANCING
JUSTICE – LA
1145 Wilshire Blvd.
Los Angeles, CA 90017
Tel.: (213) 977-7500
Fax: (213) 977-7595


Phi Nguyen
GA Bar No. 578019
pnguyen@advancingjustice-atlanta.org
Hillary Li
GA Bar No. 898375
hli@advancingjustice-atlanta.org
ASIAN AMERICANS ADVANCING
JUSTICE – ATLANTA
5680 Oakbrook Parkway, Suite 148
Norcross, GA 30093
Tel.: (404) 585-8446


Lindsay.church@alston.com
Georgia Bar No. 651190
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

Brian J. Sutherland, Esq.
bsutherland@buckleybeal.com
Georgia Bar No. 105408
BUCKLEY BEAL, LLP
600 Peachtree Street
Suite 3900
Atlanta, Georgia 105408
Tel.: (404 781-1100
Fax: (404) 781-1101

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November 2018, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system and served a copy by

electronic mail upon the following attorneys for the defendant.

Cristina M. Correia
ccorreia@law.ga.gov
Russell David Willard
rwillard@law.ga.gov
Georgia Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

*/s/ Daniel Huynh*
Daniel Huynh
Daniel.huynh@alston.com
Georgia Bar No. 987369
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777
Fax: (404) 881-7777
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), counsel hereby certifies that this motion was prepared using Times New Roman 14 point font.

This 27th day of November, 2018

*/s/ Daniel Huynh*
Daniel Huynh
Daniel.huynh@alston.com
Georgia Bar No. 987369
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777
Fax: (404) 881-7777
*Attorney for Plaintiffs*
